**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

GREG FLORES, BRIAN FLORES, SUSAN F.
HAMILTON, DONALD FLORES, JR., AND
MARK FLORES

No.:  1:08-CV-471-LTS-RHW

Plaintiffs,

v.

STATE FARM FIRE AND CASUALTY
COMPANY,

Defendant.

**STATE FARM FIRE AND CASUALTY COMPANY'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO
EXCLUDE PLAINTIFFS' EXPERT GIDDINGS EMERY**

# TABLE OF CONTENTS

I.      Preliminary Statement ....................................................................................... 1

II.     Threshold Scrutiny of Expert Testimony ....................................................... 2

III.    Plaintiffs Cannot Establish That Mr. Emery's Opinion Is Based on reliable Data ............ 5

        A.      Mr. Emery Has No Understanding Of The Construction And Quality Of Plaintiffs' House ........................................................................ 6

        B.      Mr. Emery Has No Understanding of the Weather Conditions at Plaintiffs' Property .......................................................................... 8

IV.     Plaintiffs Cannot Show That Mr. Emery's Methods Are Sound ..................................... 10

        A.      Mr. Emery's Methodology For Identifying Wind as the Cause of Destruction Is Unknown or Unreliable ................................................. 10

        B.      Mr. Emery Does Not Exclude Flooding as the Cause of Destruction of Plaintiffs' House ............................................................ 12

V.      Mr. Emery Is Unqualified to Testify Regarding Weather Conditions at Plaintiffs' House or the Nature of the Peril that Destroyed Their House .................................... 16

VI.     Conclusion .................................................................................................. 18

## I.    PRELIMINARY STATEMENT

State Farm Fire and Casualty Company respectfully submits this memorandum in support of its motion, pursuant to Federal Rules of Evidence 104(a), 702, 703, and 403, to exclude the testimony of Plaintiffs' expert witness, Giddings Emery.   Plaintiffs proffer Mr. Emery, an engineer, to testify that wind, rather than water, destroyed Plaintiffs' house.   However, Mr. Emery's report is little more than unsupported *ipse dixit* masquerading as an engineering analysis.

Mr. Emery's report contain none of the indicia of an actual engineering report.   Mr. Emery does not discuss the weather conditions at Plaintiffs' property and there is virtually no information regarding the design or construction of Plaintiffs' house.   In fact, Mr. Emery's deposition testimony reveals that he knows virtually nothing about either of these topics, including the timing of storm surge heights and wind speeds at Plaintiffs' property.   Whether Mr. Emery even inspected Plaintiffs' property is doubtful because of the contradictory accounts he has given regarding the supposed inspection.

The report also contains no engineering analysis to support Mr. Emery's conclusion that wind destroyed Plaintiffs' house.   Instead, Mr. Emery only declares that he reviewed certain generic categories of evidence and has concluded that wind destroyed the house.   Yet there are no calculations, no analysis of any physical evidence, and no description of the methodology, if any, he used to arrive at this conclusion.   In short, Mr. Emery does not offer an engineering analysis of any kind in his report.   He simply declares his willingness to testify in trial that wind destroyed Plaintiffs' house.

Finally, Mr. Emery is unqualified to offer his proposed testimony.   At deposition, Mr. Emery frankly conceded that, because he is not a meteorologist or oceanographer, he is unqualified to offer testimony relating to these topics.   Indeed, Mr. Emery even cited to his own

1

lack of qualifications when declining to discuss the general weather conditions of Hurricane Katrina, even though this topic comprises the first page of his report. Yet, despite his undisputed lack of meteorological and oceanographical expertise, his opinions heavily rely on his lay opinions of wind speeds, wave heights, and other weather phenomena.

Mr. Emery's conclusory opinions fall woefully short of the stringent standards required for expert testimony under *Daubert, v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) and its progeny. Indeed, the analysis-free nature of Mr. Emery's report precludes any assessment that his reasoning is reliable and has been properly applied to the facts of this case. For multiple reasons, Mr. Emery's opinion is unreliable and inadmissible. Plaintiffs cannot meet their burden to show otherwise.

## II.    THRESHOLD SCRUTINY OF EXPERT TESTIMONY

As the proponents of Mr. Emery's testimony, Plaintiffs bear the burden of showing that it is admissible. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999) (citation omitted), *superseded in part by rule on other grounds*, Fed. R. Evid. 103(a); *see also Daubert*, 509 U.S. at 592 n.10. State Farm does ***not*** bear the burden of demonstrating its inadmissibility. *See Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 102 (D. Conn. 2006); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

*Daubert* carefully distinguishes between the threshold admissibility inquiry that Plaintiffs must satisfy and the role of cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky ***but admissible*** evidence. . . .   These conventional devices . . . are the appropriate safeguards ***where*** the basis of scientific testimony ***meets the***

*standards* of Rule 702." *Daubert*, 509 U.S. at 596 (emphasis added). As the highlighted language shows, Plaintiffs must first satisfy their burden of demonstrating that the proffered evidence is admissible. *See McLendon v. Ga. Kaolin, Co.*, 841 F. Supp. 415, 418 (M.D. Ga. 1994) ("[T]hese devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702."); *see also Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996) ("cross-examination at trial" cannot "take the place of scientific peer review"); *Porter v. Whitehall Labs., Inc.*, 791 F. Supp. 1335, 1345 & n.10 (S.D. Ind. 1992) ("[A]n expert's opinion must have *some* basis other than hypothesis before the opinion may have the privilege of being assailed by cross-examination."), *aff'd*, 9 F.3d 607 (7th Cir. 1993).

In evaluating the admissibility of Mr. Emery's testimony, this Court must make a threshold assessment of "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Throughout the evaluation, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000), require far "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Yet Mr. Emery has neither relied on scientific data applicable to these facts, nor reliably applied a scientific methodology.

Federal Rule of Evidence 702 requires a sound basis and a sound methodology, properly applied to the facts of the case, before an opinion can be admitted into evidence.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if* (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

3

methods, *and* (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added). Thus, courts must exclude expert evidence that is not "based on sufficient facts or data," that is not "the product of reliable principles and methods," or whose methods are not applied "reliably to the facts of the case." *Id.* Indeed, "*any* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*.'" Fed. R. Evid. 702 advisory committee's note (2000) (alteration in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

Of course, an expert's "conclusions and methodology are not entirely distinct from one another," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and the difference between an expert's conclusions and methodology "has only limited practical import." *In re Paoli*, 35 F.3d at 746. "When a judge disagrees with the conclusions of an expert, it will generally be because he or she thinks that there is a mistake at some step in the investigative or reasoning process of that expert." *Id.* As part of its gatekeeping function, the court "'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (citation omitted). Upon doing so, a court may, for example, "conclude that there is simply too great an analytical gap between the data and the opinion proffered," and properly preclude the expert's testimony. *Joiner*, 522 U.S. at 146.

"It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Indeed, a core rule of evidence is that "speculation is unreliable . . . and is inadmissible." *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003). "The courtroom is not the

4

place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

Even if Mr Emery's testimony could somehow survive this Court's threshold scrutiny under Rule 702 (which it cannot), it would be subject to further review and preclusion under Rule 403. "[E]xpert evidence can be both powerful and quite misleading. . . . Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. To this end, an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

### III.    PLAINTIFFS CANNOT ESTABLISH THAT MR. EMERY'S OPINION IS BASED ON RELIABLE DATA

As part of its role as gatekeeper, the district court must ensure that the underlying facts and data upon which a proffered expert's opinion are based are in and of themselves reliable. *See Allen v. Pa. Eng'g Corp*, 102 F.3d 194, 196 (5th Cir. 1996); *Daubert*, 509 U.S. at 95. If an expert's opinion is based on unreliable facts, the opinion must be excluded. *See Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311 (5th Cir. 1990); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *amended by* 199 F.3d 158 (3d Cir. 2000); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003). Here, the data used by Mr. Emery suffers from a variety of fatal ills.

A.    **Mr. Emery Has No Understanding Of The Construction And Quality Of Plaintiffs' House**

Because Mr. Emery purports to provide expert engineering testimony as to the cause of destruction of Plaintiffs' house, it is crucial that he thoroughly understand its construction, makeup, design, and quality. Here, Mr. Emery has little to no knowledge of these features of Plaintiffs' house and, as a result, cannot provide reliable testimony as to the whether wind or storm surge destroyed it.

Mr. Emery's knowledge of Plaintiffs' house is superficial at best. His report's description of the house reveals only that it was a "single story wood frame structure atop a raised timber post foundation," but little else. This is not surprising because he has never seen a pre-Hurricane Katrina photograph of the house (Emery Dep. at 37:22-24, attached as Ex. A) and knows nothing about its construction aside from what he could glean from six post-storm photographs provided by Plaintiffs.[1] (Ex. A at 36:5-37:3.) These photographs show, from a distance, scattered debris and the pilings that remained of the house. (Report of Giddings Emery at Attachment B, attached as Ex. B.) Yet Mr. Emery admits that he has no idea whether this debris was from Plaintiffs' house or that of a neighbor, and he has never asked Plaintiffs to find out. (Ex. A at 37:7-38:7.)

Mr. Emery also has little or no knowledge of the specific features of Plaintiffs' house that could impact its ability to withstand hurricane winds. For example, he has no knowledge of the age of the house, the code under which it was built, or the wind speed for which it was designed. (Ex. A at 40:1-41:19.) And, his report provides no discussion of whether the house contained

---

[1]    The deposition of Mr. Emery occurred on April 6, 2010. Counsel for State Farm has not received a final copy of the transcript, but will supplement the brief when the final copy is received if the Court so wishes. Plaintiffs waived the reading and signing of the deposition transcript. (Ex. A at 153:14-15.)

any wind-resistant features such as anchor bolts or hurricane straps.  (Ex. B, *passim*.)  These omissions severely undermine Mr. Emery's ability to conclude that wind destroyed Plaintiffs' property because, by his own admission, a house's susceptibility to wind damage depends on the method of construction, the code under which it was built, and whether it is older or newer construction.  (Ex. A at 32:14-19.)  Indeed, Mr. Emery opines that a house's reaction to winds is highly individualized, such that the same winds may destroy one house but not another.  (*Id.* at 32:14-19, 63:24-64:6.)  Thus, because Mr. Emery knows so little about the wind-resistant features of Plaintiffs' house, he simply does not have the data necessary to conclude that wind destroyed Plaintiffs' house.

Nor are Mr. Emery's opinions supported by his alleged inspection of Plaintiffs' property in September 2009.  Exactly what this inspection entailed, or whether it actually took place, is unclear due to Mr. Emery's blatantly contradictory statements regarding the inspection.  For example, the report states Mr. Emery observed "building artifacts and debris fields" during the site inspection, Ex. B at 3, but at deposition he stated that "No debris at all [was] left" by the time of the inspection, Ex. A at 24:7-8.  The report also states that "[w]e . . . documented the site with photos," Ex. B at 3, but at deposition Mr. Emery stated that he did not take any photographs of the property during the inspection, Ex. A at 24:9-10.  Indeed, even the report's use of the term "we" with regard to the inspection is inconsistent with Mr. Emery's statement at deposition that no one accompanied him on his inspection of the property.[2]  (Ex. A at 93:21-94:1.)  Mr. Emery's report places heavy reliance on the knowledge acquired through this supposed inspection, Ex. B

---

[2]     The unexplained reference to "we" continues throughout Mr. Emery's report.  For example, the report refers to the "undersigned individuals," "our firm opinion," and the conclusion that "we came to."  (Ex. B at 3, 4.)  Why the report refers to "we" remains a mystery given that Mr. Emery is the only person to sign the report.  (*Id.* at 4.)

at 3, but the credibility of these conclusions is dubious given his numerous contradictions regarding the inspection.

In short, Mr. Emery's report lacks the data required to perform an engineering analysis of the destruction of Plaintiffs' house. As such, Mr. Emery's report is not supported by reliable data and must be excluded.

### B.    Mr. Emery Has No Understanding of the Weather Conditions at Plaintiffs' Property

Mr. Emery's report is also unreliable because of his nearly complete lack of knowledge concerning the weather conditions at Plaintiffs' property. Without a thorough understanding of the storm surge heights, wind speeds, and their relative timing at Plaintiffs' property, Mr. Emery is unequipped to testify that wind, rather than water, destroyed Plaintiffs' house.

Although Mr. Emery's report purports to establish that wind destroyed Plaintiffs' house, his report contains no data, or even estimates, regarding the weather conditions at Plaintiffs' property. For example, the report does not discuss the storm surge heights, storm surge speeds, the presence of wave action, wind speeds, or the timing of wind and storm surge at the property. The only weather-related information the report does contain is a generalized overview of Hurricane Katrina and the conditions it purportedly created. Yet, this overview describes weather conditions at distant locations such as the Mississippi/Louisiana border and Mobile, Alabama – not Plaintiffs' property. Indeed, Mr. Emery admits that he cannot tie any of these conditions to Plaintiffs' property.[3] Further, Mr. Emery openly admits that he is not even qualified to discuss these generalized weather phenomena, much less whether they occurred at

---

[3]    For example, he discusses the possible occurrence of feeder bands, tornadoes, and mesovorteces as a result of Hurricane Katrina, but admits he has no evidence that any of these phenomena occurred at Plaintiffs' property. (Ex. A at 44:11-18, 46:10-19, 47:3-5.)

Plaintiffs' house. (Ex. A at 15:17-22, 47:3-5, 88:22-89:2; *see also* Part V, *infra*.) In short, Mr. Emery's report does not contain the specific weather data required to conclude that Plaintiffs' house – rather than another house somewhere along the Gulf Coast – was destroyed by wind.

In light of these glaring deficiencies, Mr. Emery attempted to clarify at deposition his estimate of the weather conditions at Plaintiffs' property. Yet these opinions either contradict his own report or are otherwise unsupported. For example, Mr. Emery testified that he believed winds and wind gusts reached 130 and 150 mph, respectively, at Plaintiffs' property, even though the NOAA Wind Gust Analysis attached to his report shows gusts only reaching 120 mph on the Mississippi Gulf Coast. (Ex. A at 72:13-73:5; Ex. B, Attachment A at 5.) Mr. Emery had no explanation for this discrepancy, other than to blame the meteorologists for disagreeing with his lay opinion.[4] Not surprisingly, Mr. Emery did not disclose the source of his newfound opinion on the wind speeds at Plaintiffs' property. At other points in his deposition Mr. Emery simply admitted that he did not know key information relating to the weather conditions at Plaintiffs' property. For example, he admitted that he has no understanding of the timing of the storm surge heights and wind speeds at the property. (Ex. A at 40:1-15, 41:1-19, 62:9-11, 65:22-66:8.) Nor did he know of any data to support his assertion that there was no wave action at the property. (*Id.* at 89:16-25.)

In short, Mr. Emery's proposed testimony does not contain any reliable data, or even estimates, regarding the weather conditions at Plaintiffs' property. Without any such data it is

---

[4]    When this discrepancy was brought to Mr. Emery's attention at deposition, he testified that, "Those damn meteorologists are like cats. It's hard to herd them up and get them all to say the same thing." (Ex. A at 72:24-73:5.)

simply inconceivable that Mr. Emery could reliably determine that wind, rather than water, destroyed Plaintiffs' property. Therefore, his opinion must be excluded.

### IV.  PLAINTIFFS CANNOT SHOW THAT MR. EMERY'S METHODS ARE SOUND

For every conclusion contained in an expert's proposed testimony, the court must determine if the methodology leading to that conclusion is sound. *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996). A court may appropriately exclude expert testimony when it finds that an expert has extrapolated data, and there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998). Such testimony should also be excluded when it is speculative or not amenable to scientific verification. *Moore*, 151 F.3d at 273. Under *Daubert*, an engineering expert must "show how his conclusion . . . is grounded in – follows from – an expert study of the problem." *Navarro v Fuji Heavy Indus., Ltd.*, 117 F.3d 1027, 1032 (7th Cir. 1997). Plaintiffs cannot meet their burden to show that Mr. Emery's methods are reliable.

### A.  Mr. Emery's Methodology For Identifying Wind as the Cause of Destruction Is Unknown or Unreliable

Before Plaintiffs can show that the methodology Mr. Emery employed was reliable, that methodology must at least be identifiable and amenable to verification through scientific scrutiny. *Moore*, 151 F.3d at 273. Yet Mr. Emery's methodology, if any, for identifying wind as the cause of the destruction of Plaintiffs' house is unknown and plainly fails this threshold level of inquiry.

Mr. Emery's report provides no information at all on the methods he may have used to determine that wind destroyed Plaintiffs' house. The "Analysis and Conclusions" section of his report is a mere six-and-a-half lines long, and only discloses that Mr. Emery has reviewed certain

10

generic categories of evidence and is of the opinion that wind destroyed Plaintiffs' house.  Yet, the report does nothing to explain how Mr. Emery reached this conclusion.  For example, the report claims that Mr. Emery "examined the site," "reviewed photos," and "considered the different weather reports," but does not identify what was learned from this evidence or how it supports the conclusion that wind destroyed Plaintiffs' house.  (Ex. B at 4.)  Similarly, the report concludes that the "winds systematically removed portions of the roof and then the walls," but points to no analysis, calculations, or physical evidence to support this conclusion.  In fact, when questioned about this description at deposition, Mr. Emery conceded that he had no proof that the house was destroyed in this manner.  (Ex. A at 35:24-36:4.)  Instead, his description was merely based on "anecdotal evidence" of what he was told happened to *other* houses.

Mr. Emery's methodology for determining that wind destroyed Plaintiffs' house remains unclear even after hours of deposition testimony in this case.  The key source of "evidence" he pointed to at deposition to support his conclusion was his "experiences" investigating the Jordan River Estates neighborhood.  (Ex. A at 24:25-25:6, 28:10-15.)  According to Mr. Emery, he had investigated several properties in the Jordan River Estates and found that they were destroyed by wind.  (*Id.* at 28:10-29:19.)  He also claims that the damage and debris patterns were similar there and at Plaintiffs' property.  Based on these purported similarities, Mr. Emery simply concluded that wind must have also destroyed Plaintiffs' property.  (*Id.* at 29:2-19.)  However, Mr. Emery provides no evidence, photographs, or analysis to support this conclusion.  Indeed, his report does not even mention the Jordan River Estates, nor does it attach the "specific meteorological reports" Mr. Emery purportedly relied upon in determining that wind destroyed that neighborhood.  (*Id.* 82:10-15.)  Nonetheless, Mr. Emery admits that comparing Plaintiffs'

property to the Jordan River Estates was the only thing he did to test his conclusion that wind destroyed Plaintiffs' house. (*Id.* at 32:20-25.)

In short, there is no indication that Mr. Emery has employed an identifiable and scientifically verifiable methodology in concluding that wind destroyed Plaintiffs' house. Without more, Plaintiffs cannot show that Mr. Emery's opinions are reliable or that they are anything more than impermissible *ipse dixit*. Accordingly, his opinions are not reliable and must be excluded.

**B.    Mr. Emery Does Not Exclude Flooding as the Cause of Destruction of Plaintiffs' House**

Mr. Emery's causation opinion is also unreliable because he fails to exclude storm surge as a likely cause of destruction. Mr. Emery concedes that storm surge flooding on Plaintiffs' property was higher than the roof of the house. (Ex. A at 87:12-17.) He also acknowledges in his report that "[t]he damages caused by flooding and wave action can be severe" and that water has more force per square foot at five mph than wind does at 140 mph. (Ex. B at 3.) Despite recognizing the destructive potential of storm surge, Mr. Emery conspicuously fails to rule out flooding as a cause of Plaintiffs' loss. His report is silent on this issue. It does not calculate the force that flooding would have had on Plaintiffs' property. It identifies no physical evidence or weather data to exclude damage or destruction by storm surge. Nor does it even present a theory as to why storm surge could not have damaged or destroyed Plaintiffs' house. Any mention of the effect of storm surge on Plaintiffs' house is simply absent from the report.

At deposition, Mr. Emery attempted to explain why he does not believe storm surge destroyed Plaintiffs' house. Yet, none of these theories are mentioned in his report, and none withstand scrutiny.

For example, Mr. Emery claims that the pattern of damage surrounding Plaintiffs' property proves that flooding did not destroy the house. According to Mr. Emery, flooding can be expected to cause uniform levels of destruction in an area, while the damage caused by wind is much more sporadic in nature. (Ex. A at 30:6-13, 64:5-6 ("[Flooding] certainly wipes a cleaner slate than wind.") Relying on this theory, Mr. Emery contends that flooding could not have destroyed Plaintiffs' house because satellite imagery shows a single house two blocks away that was not rendered a slab. (*Id.* at 56:20-57:19; *see also* Satellite Photographs of Neighborhood, attached as Ex. C.) Even though every other house in Plaintiffs' neighborhood was reduced to a slab, the fact that one house remained standing indicated to Mr. Emery that the damage was not uniform enough to signify flooding. According to Mr. Emery, this alone was sufficient to rule out the effect of 27 feet of storm surge on Plaintiffs' property. (Ex. A at 57:7-9.)

Mr. Emery's interpretation of the flood damage to the vicinity of Plaintiffs' house cannot withstand scrutiny. Accepting as true the general idea that storm surge produces more complete and uniform destruction than wind, the vast and uniformly complete destruction of Plaintiffs' surroundings compels the conclusion that storm surge destroyed Plaintiffs' house. Satellite images reveal that each of the houses on Plaintiffs' waterfront block, and all but one house in Plaintiffs' neighborhood, were reduced to slabs by Hurricane Katrina. (Ex. C.) Even Mr. Emery admits that these photographs showed "widespread damage" in the vicinity of Plaintiffs' house. (Ex. A at 31:14-19.) By his own logic, this uniform level of destruction is consistent only with flood damage. Certainly, it is inconsistent with damage from wind, which he contends is "selective" and occurs only "in a small area." (*Id.* at 32:14-19.)

Mr. Emery's conclusions are also unreliable because of his uninformed reliance on the single house that was not rendered a slab. Despite the pivotal role of that house to his analysis,

13

he knows virtually nothing about it and does not even discuss it in his report. He has never visited it and has no notes, photographs, or other information showing the condition that it was actually in after the hurricane. (Ex. A at 57:13-58:4.) In other words, Mr. Emery cannot rule out the possibility that the surviving house was anything more than a surviving roof with gutted lower floors after the hurricane. (*Id.* at 55:15-25.) Nor is there any indication in his report or deposition testimony that he has any knowledge of how the construction quality, elevation, or other features of that house compared to that of the Plaintiffs. Accordingly, he cannot exclude the possibility that the house survived the storm surge – in some form – due to having a higher elevation or superior construction quality. Therefore, his reliance on this house to show that storm surge caused no damage in Plaintiffs' waterfront neighborhood is specious.

At deposition, Mr. Emery also asserted that the storm surge that flooded Plaintiffs' property lacked the velocity or wave action required to destroy the house. (Ex. A at 33:1-19, 54:22-55:7.) According to him, there was "[n]o wave action to speak of" and the force of the storm surge was analogous to "filling your bathtub" with water. (*Id.* at 33:9-19.) Neither assertion is reliable. For example, Mr. Emery candidly admits that he has no data to back his assertion that there were no waves at Plaintiffs' property. (*Id.* at 89:24-25 ("I have seen no data that supports it[.]"). He also admits that he is not even qualified to opine on the presence or absence of wave action, or the amount of wind needed to create waves. (*Id.* at 88:22-89:2, 90:3-8.)[5] In light of Mr. Emery's admitted lack of data and expertise, his testimony regarding wave action at Plaintiffs' properly is purely speculative and unreliable. Moreover, it is critical to the

---

[5]    When Mr. Emery did attempt to explain the physics of creating waves at deposition, he contradicted himself, saying at one point that it depended on the depth of the water and later that it did not. (Ex. A at 62:17-18 ("[I]t's very depth dependent."); *id.* at 88:2-3 ("Wave action is not dependent upon depth.").)

reliability of his report because he admits that if wave action did exist, it would have destroyed Plaintiffs' house. (*Id.* at 90:9-13.)

Mr. Emery's testimony regarding the force of the storm surge is similarly unreliable. Critically, he does not identify *any* data regarding the speed of the storm surge. This omission, however, is inexcusable since he states in his report that even a five mph movement of water has more force than wind at 140 mph. (Ex. B at 3.) Mr. Emery also failed to perform any calculations regarding the effect of the admitted storm surge on Plaintiffs' property. (Ex. A at 53:10-15.) His excuse for this omission is that the timing of the wind and water and the survival of other structures rendered such analysis unnecessary. (*Id.*) Yet, this excuse does not withstand scrutiny because Mr. Emery admits that he does not know the timing of the wind and the water, *id.* at 62:9-11, 65:22-66:1, and because the destruction of all but one house in Plaintiffs' neighborhood reflects destruction from storm surge, not wind.

Mr. Emery's failure to exclude storm surge as the cause of Plaintiffs' loss is fatal to his report. The "exclusion of alternative causes" is required for a reliable causation opinion. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000); *accord United States v. Eff*, 461 F. Supp. 2d 529, 534 (E.D. Tex. 2006). The inadequate treatment of other potential causes necessarily undermines the reliability of an expert's opinion. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004); *Winters v. Fru-Con, Inc.* 498 F.3d 734, 743 (7th Cir. 2007); *see also Cotroneo v. Shaw Envtl. & Infrastructure, Inc.*, No. H-05-1250, 2007 WL 3145791, at *5 & n.23 (S.D. Tex. Oct. 25, 2007). Among other things, an expert must consider and rule out the combination of the probabilities that alternative causal candidates led to the damage because their combined probabilities may exclude even the possibility that the expert's causal candidate can exceed the "more likely than not" threshold for establishing causation. *See*

*Cavallo v. Star Enter.*, 892 F. Supp. 756, 771 (E.D. Va. 1996), *aff'd in relevant part*, 100 F.3d 1150 (4th Cir. 1996). So, too, "if [the] experts failed to rule out alternative causes, it means that these alternative causes may have been the sole causes" of the damages. *In re Paoli R.R. Yard Litig.*, 35 F.3d 717, 761 & n.31 (3d Cir. 1994). An expert must rigorously evaluate and rule out potential alternative causes and not "simply pick[] the cause that is most advantageous to [plaintiff's] claim." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *see also Brown*, 919 F.2d at 312. Plaintiffs must show that Mr. Emery's opinion "is grounded in – follows from – an expert study of the problem." *Navarro*, 117 F.3d at 1032. They cannot do so here.

### V.    MR. EMERY IS UNQUALIFIED TO TESTIFY REGARDING WEATHER CONDITIONS AT PLAINTIFFS' HOUSE OR THE NATURE OF THE PERIL THAT DESTROYED THEIR HOUSE

Mr. Emery's proposed testimony is also inadmissible because he is unqualified to offer the meteorological and oceanographical opinions that permeate his proposed testimony.

Under both Federal Rule of Evidence 702 and *Daubert,* trial courts are tasked to carefully examine an expert's qualifications and bar experts from testifying on matters outside of the area of their expertise. *Sullivan v. Rowan Cos.*, 952 F.2d 141, 144 (5th Cir. 1992) (affirming lower court finding that geologist was not qualified to provide expert testimony in field of metallurgy); *Rosado v. Deters*, 5 F.3d 119, 124 n.9 (5th Cir. 1993). Where a witness is qualified as an expert to testify in a particular area, the court must not permit the witness to testify on matters outside of that area or give lay testimony about a subject beyond his field of knowledge. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 459-60 (5th Cir. 1996); *Edmonds v. Ill. Cent. Gulf R.R.*, 910 F.2d 1284, 1287 (5th Cir. 1990).

It is undisputed that Mr. Emery is not a meteorologist or oceanographer and that he is unqualified to offer expert testimony in these fields. (Ex. A at 15:17-22, 47:19-24, 88:22-89:2.) Mr. Emery openly conceded this point throughout his deposition, and even invoked his own lack of expertise in declining to discuss the general weather conditions section of his report. (*Id.*) Yet, despite Mr. Emery's undisputed lack of qualifications, his proposed testimony is replete with his lay opinions regarding the weather conditions that existed generally during Hurricane Katrina and at Plaintiffs' property. To name a few examples, he relied upon his own lay opinion at deposition to opine on: (i) the presence of waves at Plaintiffs' property, *id.* at 66:2-8; (ii) the physics of wave creation, *id.* at 62:9-13, 88:22-89:25; (iii) the velocity of storm surge on Plaintiffs' property, *id.* at 54:22-55:7; and (iv) the damage patterns created by windstorms and flooding, *id.* at 32:5-11, 64:1-6. As discussed *supra*, Mr. Emery's conclusion that wind, rather than water, destroyed Plaintiffs' house relies heavily on each of these uninformed, lay opinions. By contrast, his conclusions do not rely on any calculations or analysis rooted in *engineering*, the field for which he is offered as an expert. Mr. Emery performed no calculations regarding the force of wind or water on Plaintiffs' property. (*Id.* at 50:11-14, 53:10-15.) Likewise, his report presents no engineering analysis of Plaintiffs' house or any other physical evidence relevant to their loss. Regardless of his credentials as an engineer, Mr. Emery simply is not qualified to offer his proposed testimony. Plaintiffs cannot show otherwise, and his testimony should be excluded as a result.

## VI.     CONCLUSION

For the foregoing reasons, State Farm respectfully requests that its Motion to Exclude the

expert testimony and expert report of Mr. Emery be granted.

DATED:  April 15, 2010.

                                        Respectfully submitted,

                                        /s/ James H. Heidelberg

                                        JAMES H. HEIDELBERG, MSB # 2212
                                        HEIDELBERG, STEINBERGER,
                                        COLMER & BURROW, P.A.
                                        Attorneys at Law
                                        711 Delmas Avenue
                                        Pascagoula, MS 39567-1407
                                        (228) 762-8021
                                        *Attorneys for Defendant*

18

## <u>CERTIFICATE OF SERVICE</u>

I, **JAMES H. HEIDELBERG**, one of the attorneys for the Defendant, **STATE FARM FIRE & CASUALTY COMPANY**, do hereby certify that I have on this date electronically filed the foregoing document with the Clerk of Court using the ECF system which sent notification of such filing to all counsel of record.

DATED:  April 15, 2010.

*/s/ James H. Heidelberg*

JAMES H. HEIDELBERG, MSB # 2212
HEIDELBERG, STEINBERGER, COLMER
& BURROW, P.A.

Attorneys at Law
711 Delmas Avenue
Pascagoula, MS 39567-1407
(228) 762-8021
*Attorneys for Defendant*

19